# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

**GANDHI B. MORKA,**

       **Petitioner,**

**vs.**                              **No. 3:10-CV-0499-M-BK**

**UNITED STATES OF AMERICA,**

       **Respondent.**

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to Special Orders 3-251 and 3-283 and 28 U.S.C. § 636(b), this case has been referred to the undersigned for findings, conclusions, and a recommendation.

## I. BACKGROUND

### I. Factual and Procedural History

Morka has filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 as well as a supporting brief. (Doc. 1; Doc. 2). The respondent is the United States. Morka is presently serving a 60-month total sentence for conspiracy to commit mail and wire fraud, wire fraud, mail fraud, and aiding and abetting such fraud. *United States v. Morka*, 309 Fed. Appx. 888 (5th Cir. 2009). As described in the appellate court's opinion on Morka's co-defendants' appeals, this case stemmed from a fraudulent home buying scheme involving numerous co-conspirators. *United States v. Nguyen*, 504 F.3d 561, 565 (5th Cir. 2007). The scheme worked as follows: Certain co-conspirators would locate a home for sale, and Sean Nguyen (Sean), a mortgage broker and co-conspirator, would have Morka, an appraiser, prepare an inflated appraisal for the home. Other participants in the scheme would recruit a "straw

buyer," a mortgage company would prepare a loan application and purchase contract based on the straw buyer's personal information, and then the mortgage company would submit a loan application to Countrywide Mortgage. *Id.* Countrywide's loan amount, based on the bogus appraisal and sales price, would be far in excess of the property's actual value. The property seller would keep an amount equal to the equity in the house, and the remaining funds would be distributed among the conspirators. *Id.* Dai Quoc Nguyen (Dai), who the Fifth Circuit deemed a "mastermind" of the scheme, was a sales representative for a real estate broker, and he and Sean pleaded guilty to participation in the fraud. *Id.* at 565-66.

With regard to Morka's role in the scheme, Sean testified that he and Morka reached a verbal agreement for Morka to provide the inflated appraisals on nine properties based on the price Sean told him in exchange for $10,000 in cash. (Doc. 606 at 213, 256-59). Inflated appraisals bearing Morka's name were produced at trial. (Doc. 606 at 43-48, 54, 62-63). A property seller who sold her house in the course of the scheme testified that a man who looked like Morka came to her house to do the appraisal. (Doc. 607 at 209, 211, 217-218, 220-27). Additionally, Dai testified that he had identified Morka as the appraiser involved in the scheme from a photograph FBI Agent Darrell James showed him, and he knew who Morka was because they shared office space. (Doc. 607 at 197-200; *see* Doc. 607 at 58). An FBI analyst testified that hundreds of phone calls took place between Sean and Morka on or near the dates of the fraudulent transactions. (Doc. 608 at 128, 135-39). Horace Smith testified that he and Morka had been involved in a prior mortgage fraud scheme whereby Morka did phony appraisals. (Doc. 608 at 150-55). Finally, FBI fingerprint examiner, Sarah Riley, testified that she identified Morka's fingerprints on several of the original appraisals, which Morka's fingerprint expert also

confirmed.  (Doc. 608 at 214, 238-40, 271-73).

In Morka's section 2255 motion and supporting brief,  he raises numerous claims of prosecutorial misconduct, trial court error, and ineffective assistance of trial and appellate counsel, which will be addressed below seriatim.

## II.    Prosecutorial Misconduct and Trial Court Error

Morka first argues that the prosecutor committed misconduct when she improperly commented on non-existent evidence in her closing statement that conflicted with Agent James's testimony at trial.  (Doc. 1 at 7; Doc. 2 at 9-12).[1]  Next, Morka contends that the prosecutor violated *Giglio v. United States*, 405 U.S. 150, 154 (1972) by failing to disclose material impeachment evidence relating to various government witnesses.  (Doc. 2 at 13-22).  Additionally, Morka claims that the trial court plainly erred by not *sua sponte* giving a limiting instruction to the jury about the arrest of Dai after Dai testified against Morka.  (Doc. 1 at 8; Doc. 2 at 68-70).  Finally, Morka also claims in his supporting brief that the district court committed plain error by not allowing him to testify about his prior consistent statements to the FBI denying any involvement in the scheme.  (Doc. 2 at 64-67).

The government responds that the first three of these claims are procedurally barred from collateral review because Morka did not present them on direct appeal, nor did he attempt to demonstrate cause and prejudice to excuse the procedural default.  (Doc. 11 at 5-10).  The government does not respond to Morka's additional argument in his brief.  (*See generally* Doc. 11).

---

[1] All page cites in this recommendation are to the electronically generated page numbers at the top of the document on CM/ECF, not the numbering at the bottom of the pages.

A criminal defendant who fails to raise an issue on direct appeal is procedurally barred from raising the claim in a section 2255 motion absent a showing of cause and prejudice or a fundamental miscarriage of justice. *United States v. Frady*, 456 U.S. 152, 167-68 (1982). Morka did not raise any of the above issues in his direct appeal. *See* U.S.C.A. No. 08-10125, Appellate Brief filed August 27, 2008. Further, in his reply to the government's response to his section 2255 motion, Morka does not make any attempt to demonstrate cause and prejudice or a miscarriage of justice. (Doc. 14). Therefore, these claims are procedurally barred.

## III. Ineffective Assistance of Trial Counsel

Morka raises numerous claims of ineffective assistance of trial counsel. The government groups most of Morka's claims as attacks on trial counsel's strategy and has provided an affidavit from defense counsel addressing that subject. (Doc. 11 at 11-13; Doc. 12 at Akpom Affidavit). The government maintains that counsel's strategy was not deficient, and Morka cannot show prejudice from counsel's performance given the strong evidence of his guilt. (Doc. 11 at 13-14). Morka has filed a reply to his counsel's affidavit. (Doc. 14). This recommendation will first set out the law governing ineffective assistance of counsel claims. Thereafter, Morka's particular allegations, the response by the government or defense counsel, if any, and Morka's reply thereto will be discussed individually below.

### A. Governing Law

The benchmark for judging a claim of ineffective assistance of counsel is whether counsel's performance so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To make such a showing, a prisoner must prove two things. First, the prisoner

must show that counsel's performance was deficient. Second, the prisoner must establish that the deficient performance prejudiced the defense. *Id.* at 687. These principles do not establish mechanical rules. *Id.* at 696. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.* at 693.

To prove the deficient performance prong of the *Strickland* test, the prisoner must show that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 687. The proper measure of attorney performance is reasonableness under prevailing professional norms. *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*

To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* It is not enough for the defendant to show that the error had some conceivable effect on the outcome. *Id.* at 693. He or she must show that the result would have been different. In making the prejudice determination, the court should presume, absent a challenge to the judgment on the ground of insufficiency of the evidence, that the judge or jury acted according to law. *Id.* at 694.

B. Counsel's failure to prepare for trial

In his first claim of ineffective assistance, Morka contends that his attorney, Okey Akpom, did not adequately prepare for trial because he did not go through "a box full of personal and business records" Morka gave him that supported his defense that he was innocent. (Doc. 2 at 24, 30-32).

In his affidavit, Akpom disputes Morka's assertion that he did not prepare for trial sufficiently. He states that upon Morka hiring him as private counsel, he immediately ordered and reviewed the transcripts of the pretrial and trial proceedings of Morka's co-defendants, who were all found guilty. He also mailed copies of the transcripts to Morka and, in preparation for trial, met with the prosecutors on many occasions to go over the evidence against Morka, and received the discovery in the case as it related to all of the government's key witnesses. (Doc. 12, Akpom Affidavit at 3-4). Akpom also contends that he prepared for trial by interviewing the FBI agent who investigated the case and took Morka's statements, but could not interview some of the key witnesses because they were out of the state or country, and Morka was not willing to incur travel expenses for Akpom to visit them. (*Id.* at 4). Yet another key witness who did reside locally refused to speak with Akpom. (*Id.* at 4-5).

In response to Akpom's affidavit, Morka has submitted an unsworn reply as well as some supporting documentation. (Docs. 14, 15). Morka states that the trial judge admonished Akpom for not having obtained all available discovery from the government about government witness Horace Smith, which presumably relates to his claim that Akpom's trial preparation was insufficient. (Doc. 14 at 2). On the cited pages of the pretrial transcript, however, the district judge merely told Akpom that he would be "well advised" to pick up the discovery, consisting of Smith's FBI Form 302 and some bank records, from the government that day. (No. 3:05-cr-124, Doc. 604 at 32-35). This does not constitute an "admonishment" nor does it indicate that Akpom did not already have the majority of the discovery well in advance of the trial as he avers in his affidavit.

As relates to Morka's arguments that Akpom otherwise did not sufficiently prepare for

trial, Akpom's affidavit lays out the degree to which he prepared, including reviewing the complete trial transcripts of Morka's co-conspirators, meeting with Morka and the prosecutor on numerous occasions, reviewing the written discovery provided by the government, and interviewing all of the government's witnesses who were locally available. (Doc. 12, Akpom Affidavit at 4-5). This is certainly sufficient trial preparation, and Morka cannot demonstrate that counsel's performance was deficient under the circumstances. Although counsel may not have introduced into evidence all of the documents that Morka says would have proved his innocence, the presentation of evidence is a trial strategy to which the court should give significant deference. *Strickland*, 466 U.S. at 689; *see United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983) (holding that the presentation of testimonial evidence is a matter of trial strategy and complaints that defense counsel failed to present certain evidence are disfavored because allegations of what testimony would have been developed are largely speculative).

C.  Counsel's failure to discuss possible defenses with him

In a related claim, Morka contends that counsel did not discuss viable defenses with him, namely Morka's proposed defense that someone had stolen his identity and signed the appraisals with his name. Instead, he claims that counsel's theory of the case was that appraisals are not an exact science, and property innocently could be appraised above or below the market value. (Doc. 2 at 24-26, 30-31).

In his affidavit, Akpom states that he discussed Morka's defense with him, which was to be that Morka had no connection with the mortgage fraud scheme, because that was the defense Morka insisted on even though his fingerprints were found on some of the fraudulent documents. (Doc. 12, Akpom Affidavit at 4, 5). To this end, Akpom maintains that he retained a fingerprint

expert and two handwriting experts, but all of them ultimately opined that Morka was the person who signed the fraudulent home appraisals. Nevertheless, Akpom avers that he presented a strong case despite these problems, as evidenced by the fact that the jury deliberated for such an extended period of time that the trial judge contemplated giving them an *Allen* charge. (*Id.* at 5); *Allen v. United States*, 164 U.S. 492 (1896).

In his reply, Morka reiterates his contention that Akpom never discussed any trial strategy with him and insisted on using the defense that home appraisals are not an exact science. (Doc. 14 at 2). In support, he cites various portions of the transcript before the jury was selected, which contain Akpom's statements that appraisals are not always precise. (No. 3:05-cr-124, Doc. 605 at 5-7).

Upon review of the cited portions of the transcripts, Akpom did make these statements to the district judge during a pretrial conference. This does not, however, indicate that he pursued that particular trial strategy before the jury. In fact, Akpom's opening and closing statements indicate that his theory of the case was that (1) Morka was not involved in the scheme at all although he had done some legitimate business with Sean, (2) the government could not prove that any money changed hands for illicit purposes, (3) his signatures on the fraudulent appraisals had been forged, and (4) his co-defendants who had implicated him were lying criminals. (No. 3:05-cr-124, Doc. 605 at 239-55; Doc. 610 at 19-45, 49-53). Clearly, Akpom's defense was that Morka had not been involved in the scheme and the signatures on the forged documents were not his, which is the exact defense that Morka wanted. Accordingly, this claims fails.

D. Counsel's Failure to Advise Morka About the Pretrial Conference

Next, Morka contends that Akpom did not inform him of a pretrial conference which

Morka wanted to attend. (Doc. 2 at 24-25). In response, Akpom avers that he left Morka several phone messages about the hearing date, but when Morka failed to appear, Akpom accepted responsibility in court for his absence. (Doc. 12, Akpom Affidavit at 5). In reply, Morka denies that Akpom ever advised him about the pretrial conference, as evidenced by Akpom's admission in court that he had not mentioned the conference to Morka. (Doc. 14 at 3).

To some degree, the pretrial transcripts belie Morka's assertion. Akpom stated during the conference that he had not received notice of the conference until the prior day at 4:00 or 5:00 p.m., at which point he called Morka's fax number and cell phone and left messages for Morka, although he did not specify on the voicemails that there was a hearing the next day. (No. 3:05-cr-124, Doc. 604 at 2-3). Akpom and the trial judge tried to call Morka during the hearing as well and got no answer because Morka was at a real estate class. (*Id.* at 3, 39-40). Even if Akpom somehow was deficient for failing to inform Morka of the pretrial conference, Morka does not specify how the outcome of his case would have been different if he had attended the conference other than to suggest that he might have discovered Akpom's ineffectiveness earlier. (Doc. 2 at 24); *United States v. Demik,* 489 F.3d 644, 646-47 (5th Cir. 2007) (holding that a movant's claim of ineffective assistance of counsel must be stated with specificity; " allegations" and "generalized assertions" will not suffice). Thus, this claim is without merit.

E.  Counsel's Representations about Handwriting Expert

Morka next argues that counsel failed to ensure the presence at trial of the defense's document examiner, Linda James, who would have testified that Morka's signatures on the bogus appraisals were forged. (Doc. 2 at 49-52).

In his affidavit, Akpom responds that he retained James and another handwriting expert

to review the documents, but both experts opined that Morka's signatures on the fraudulent document were genuine. (Doc. 12, Akpom Affidavit at 5).

In his reply, Morka contends that Akpom has lied in his affidavit about the defense's handwriting experts' findings that Morka had signed the fraudulent appraisals as proven by the fact that Akpom told the trial judge on three occasions that the witnesses would testify that Morka had not signed the bogus appraisals. (Doc. 14 at 3-4).

The transcripts of the proceedings just before *voir dire* and just before Morka took the stand indicate that Akpom anticipated James would testify that the signatures were forged based on her cursory review of Morka's signature, but she had not reviewed his other handwriting exemplars yet. (No. 3:05-cr-124, Doc. 605 at 3-4, 8-10; Doc. 609 at 83). During trial, James was not present at the appointed time and, in her absence, Akpom rested his defense case. (No. 3:05-cr-124, Doc. 609 at 80-82, 157-58, 235). Despite any deficiency in Akpom's failure to subpoena James for trial, Morka nevertheless cannot show a reasonable probability that the outcome of his trial would have been different if James had testified on his behalf given the strength of the evidence against him.

Sean testified that he and Morka reached a verbal agreement for Morka to provide the inflated appraisals, and appraisals bearing his name and fingerprints were introduced at trial. (Doc. 606 at 43-48, 54, 62-63, 213, 256-59; Doc. 608 at 214, 238-40, 271-73). Dai also identified Morka as the appraiser involved in the scheme. (Doc. 607 at 197-200; *see* Doc. 607 at 58). Smith testified about a prior mortgage fraud scheme in which Morka was involved as an appraiser. (Doc. 608 at 150-55). Given the strong evidence against him, Morka cannot show that he was prejudiced by Akpom's failure to ensure Linda James's presence at trial. *Strickland*,

466 U.S. at 693-94.

F.  Counsel's failure to obtain sufficient discovery regarding three witnesses

*1. Horace Smith*

Next, Morka contends that counsel failed to obtain available discovery on Horace Smith and adequately impeach Smith's testimony.  In particular,  Morka alleges that Akpom should have impeached Smith's testimony that Morka was involved in fraud based on internal inconsistencies in his testimony as well as his own pending criminal sentencing and also should have called Smith's girlfriend to testify, which "in all likelihood" would have further impeached Smith.  (Doc. 2 at 47-49, 52).

The government notes that Smith presented Fed.R.Evid. 404(b) evidence that Morka had been involved in a similar mortgage fraud scheme, and Akpom extensively cross-examined him. Although Akpom ultimately was unable to discredit Smith, the government points out that does not mean that Akpom was ineffective.  (Doc. 11 at 14).  Further, the government maintains, Morka could not show prejudice stemming from Akpom's performance because Smith's testimony was just a small part of the evidence against Morka and was extrinsic evidence at that. (*Id.* at 14-15).

A review of the record reveals that Akpom was not deficient for failing to obtain discovery on Smith.  The transcript of the pretrial conference, conducted on August 7, 2008, indicates that the prosecutor had just learned of Smith's existence on July 20, 2008, and did not interview him until August 1, 2008.  (No. 3:05-cr-124, Doc. 604 at 19-21, 32-33).  Akpom came to the prosecutor's office that same day and requested copies of various materials, including Smith's Form 302, which he said he would come back for.  (*Id.* at 32-33).  Akpom did not return

to the prosecutor's office to pick up the documents as he had planned to on the day before the hearing because he was in court; however, the prosecutor did provide a copy of Smith's Form 302 at the August 7 pretrial hearing and said that Akpom could interview Smith.  (*Id.* at 21, 33-35).  The trial did not start until August 14, 2008, a week after the pretrial hearing. (No. 3:05-cr-124, Doc. 605).  Thus, Akpom did have the relevant discovery on Smith well before the trial, although he likely could have obtained it a few days earlier.

As for Morka's assertion that Akpom did not adequately impeach Smith, he does not provide any particular evidence of Smith's lies, merely stating that "there is no doubt Smith was lying" and his testimony "doesn't make any sense."  He also speculates that Smith must have gotten a reduction in his own sentence because "common sense indicates that a criminal and liar of Smith's caliber" would not assist the government without receiving something in return, and Akpom should have "investigated deeper into Smith's criminal past" to be able to find impeachment material.  (Doc. 2 at 47-48).  These allegations are conclusory and speculative, however.  *Demik,* 489 F.3d at 644.

### 2. Sarah Riley

Next, Morka maintains that counsel failed to timely request from the government documents in the possession of Sarah Riley, the FBI forensic fingerprint examiner, in reference to whether Morka's latent prints were found on some of the appraisals which bore his signature. (Doc. 2 at 55).  He claims having this information was very important to allow the defense expert, James Chilcutt, to examine the documents in a timely fashion, but instead they were mailed overnight to Chilcutt the day of Riley's testimony, and defense counsel thus was unprepared to cross-examine her.  (*Id.*).

The portion of the trial transcript relevant to this point, however, indicates that the government erroneously believed that it had given all of Riley's documentation to the defense. (No. 3:05-cr-124, Doc. 607 at 313-14, 318-319). The prosecutor even offered to personally pay for the defense expert's flight back to the trial due to the misunderstanding, so as to allow the defense expert time to review the documents. (*Id.* at 319). Akpom cannot be responsible for not requesting documents that he did not know existed until the government informed him mid-trial that Riley had more material that the prosecutor herself previously had not known about.

*3. Jack McComb*

Finally, Morka claims that during the pretrial conference, Akpom should have requested from the government all discovery Jack McComb, the examiner at the Texas Appraiser Licensing and Certification Board (the Board), had produced to the government. (Doc. 2 at 27-30). He claims that this information was very important to his defense because it would prove that McComb communicated twice in writing to Morka that there was no fraud to investigate whereas he testified at trial that there was fraud involved in the two properties charged in the indictment. (Doc. 2 at 27-28).

However, these communications to Morka obviously were in Morka's possession as well and thus counsel was not deficient in this regard. Morka's real complaint seems to be that Akpom never adequately explored the documents Morka gave to him and erred by failing to introduce as impeachment evidence, during McComb's testimony, correspondence between Morka and the Board which stated that Morka's signature on the appraisals had been forged. (Doc. 2 at 40-43, 45-46).

The record reflects that during the defense case, Morka testified on cross-examination

that he had sent a letter to the Board complaining that his name fraudulently had been used in the scheme. (No. 3:05-cr-124, Doc. 609 at 200-01). The government then called McComb as a rebuttal witness after the defense rested, and he said that there was no letter of complaint from Morka in any of the Board's records. (*Id.* at 236-37, 241-44). On cross-examination, Akpom impeached McComb by showing him a copy of Morka's letter to the Board, but did not enter the letter itself into evidence. (*Id.* at 245-46). McComb admitted that it was possible that the letter had been received by the Board, but had not been given to him. (*Id.* at 246-47). Akpom then asked to recall Morka to the stand to introduce the letter into evidence, but the court refused, ruling that the letter should have been introduced on counsel's cross-examination of McComb. (*Id.* at 248- 253).

Although counsel made a mistake in attempting to belatedly introduce the letter into evidence, no prejudice resulted from this error. Morka testified that he wrote the letter, the letter was discussed during McComb's testimony, and McComb admitted that it was a letter from Morka to the Board and that he just might not have been given a copy of it because it was not addressed to him personally. Thus, the jury's inability to read the letter was of minor consequence. *Strickland*, 466 U.S. at 693-94.

### G. Counsel's Unfamiliarity with Rules

Additionally, Morka contends that counsel was ineffective for making nonsensical arguments and requests which demonstrated his failure to understand the rules of criminal procedure. (Doc. 2 at 52-54, 55-57). Some of the examples Morka includes are of Akpom (1) asking the court to allow Morka to speak to the jury during *voir dire*, (2) disobeying a court directive, (3) attempting to recall a government witness who he had not designated as a witness

14

himself, and (4) trying to cross-examine government witnesses based on documents that had not been admitted into evidence. (*Id.*). He claims that these instances "began to accumulate not only in detriment of [Akpom's] own goodwill but [Morka's] case as well." *(Id.* at 52). Even though Morka goes to great lengths to demonstrate Akpom's mis-steps, he does not explain how these alleged deficiencies prejudiced him in any way. *Demik,* 489 F.3d at 646-47.

### H. Failure to Prepare Morka to Testify and ask for Reversal of *In Limine* Ruling

Next, Morka claims that Akpom was ineffective for failing to (1) prepare Morka to testify and (2) ask the district court before his testimony to reverse its ruling *in limine* disallowing evidence of Morka's prior consistent statement to the FBI denying his involvement in the scheme. (Doc. 2 at 35-40).

In his responsive affidavit, Akpom avers that Morka decided early on in the representation to testify even though Akpom was not in favor of it. (Doc. 12, Akpom Affidavit at 4). Akpom states that he and Morka spent many hours preparing for Morka's testimony. He also consulted with Morka during the trial and during a recess, and Morka indicated on the record that he wished to testify and was prepared to do so. (*Id.*).

Morka replies that he had decided not to testify and told the trial judge of his decision, but the trial judge told him that no one could refute the signatures on the fraudulent documents except Morka because there were no known signatures of Morka to put on the record for comparison. (Doc. 14 at 2-3). After consulting with Akpom, Morka changed his mind and decided to testify because Akpom told him that it would be best and that only Morka could tell the jury about his prior consistent statement to the FBI denying his involvement in the scheme. (*Id.* at 3).

15

A review of the record indicates that this claim fails as well. Prior to trial, the court ruled *in limine* that Morka would not be able to provide evidence of his prior consistent statements to the FBI in which he denied involvement in the scheme. (No. 3:05-cr-124, Doc. 604 at 40-43). At trial, the judge discussed at length with Morka his right to testify and the implications of his decision and informed him that if his defense was that the signatures on the fraudulent documents were not his, he was the only person who could tell that to the jury because there were no known writing samples of his to be used for comparison. (No. 3:05-cr-124, Doc. 609 at 87-89). The court gave Morka and Akpom time to confer, Morka stated that he had no questions and had sufficient time to confer with Akpom about his decision, and he had decided not to testify. (*Id.* at 89-90). The judge then reiterated that if Morka did not testify, there would be no evidence for the jury to consider that the fraudulent documents had not been signed by him, at which point Morka conferred with Akpom two more times, decided that he wanted to testify, and stated that he had no further questions on the matter. (*Id.* at 90-92).

During his testimony, Morka repeatedly stated that he had denied in his three FBI interviews any involvement in the fraudulent scheme. (*Id.* at 131, 147, 148, 149, 155-56). Ultimately, the government objected to this testimony, and the court sustained the objection based on its prior *in limine* ruling. (*Id.* at 158-60). Akpom stated that he had not understood the court's *in limine* ruling to prevent Morka from testifying in that manner as Akpom thought he was just prevented from asking the FBI agent whether Morka had denied involvement. (*Id.* at 160-63). The court rejected Akpom's arguments, but also refused the government's request to strike Morka's previous testimony as to his denials. (*Id.* at 160-64).

Although Morka and Akpom differ in their statements as to how much time was spent

preparing Morka to testify, Akpom's statements are sworn while Morka's are not, thus giving Akpom's averments somewhat more weight. (*Cf.* Doc. 12 at Exh. 1 and Doc. 14); *Roberts v. Dutton*, 368 F.2d 465, 474 (5th Cir. 1966) (noting that sworn testimony ordinarily is ascribed more weight and credit than an unsworn statement). Even if Morka had submitted a counter-affidavit, the court can fairly resolve this claim on the record without an evidentiary hearing. *See United States v. Smith*, 915 F.2d 959, 964 (5th Cir. 1990); *United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. 1981). Morka repeatedly stated at trial that he understood the implications of his right to testify, did not have any questions, and had adequate time to confer with Akpom about his decision. (Trial Trans. Vol. 6 at 87-92). He should not now be heard to disavow those statements.

As for Morka's complaint that Akpom should have asked the court to overrule its *in limine* decision disallowing his testimony about his prior consistent statements to the FBI, Morka cannot show prejudice stemming from counsel's failure as required under *Strickland*. Despite the court's *in limine* ruling, Morka repeatedly testified that he had denied culpability to the FBI, and the court refused to strike those statements. (*Id.* at 131, 147, 148, 149, 155-56, 163-64). Thus, this claim should be denied as meritless.

I.  Counsel's Failure to Recall Dai or Ask for a Limiting Instruction About Dai

Next, Morka argues that counsel erroneously failed to (1) recall Dai to the stand to "clarify" certain testimony he gave or (2) ask the judge to inform the jury about Dai's perjured testimony which Morka claims led to Dai's mid-trial arrest for violating his supervised release. (Doc. 2 at 19-20, 59-62). He claims that Dai testified during Morka's case that he did not know Morka, while he testified in a different co-conspirator's trial that he did know Morka. (*Id.* at 60-

61). Morka also contends that not giving a limiting instruction to the jury about Dai's arrest prejudiced Morka because the jury was presented with testimony the government knew was perjured, and Morka should have been allowed to cross-examine Dai regarding the inconsistencies between his testimonies. (*Id.* at 62).

The government responds that there is no indication that the jury was ever informed that Dai was arrested, so there was no need for a limiting instruction, and counsel thus could not have been ineffective.[2]

The trial transcript reveals that Dai testified in the government's case in chief that Morka was the appraiser for one of the fraudulent properties and that Dai had identified a photo of Morka for the FBI although Dai could not identify Morka in court five years after the fact. (Trial Trans. 4 at 198-200). On cross-examination by Akpom, Dai testified that he had only seen Morka once or twice, he did not know Morka, and he had never given money to Morka. (*Id.* at 207-08). Although it appears that Dai was arrested for a supervised release violation following his testimony against Morka, the seven-minute portion of the trial record discussing the arrest is sealed, and it is unclear what the violation stemmed from. (Trial Trans. 5 at 357-58).

While Morka insists that Akpom should have recalled Dai to "clarify" his testimony, (Doc. 2 at 59), Akpom already had impeached Dai and gotten him to admit that he did not know Morka and had never given him money. It does not appear that seeking "clarification" of Dai's testimony would significantly have furthered Morka's case. With regard to Morka's contention that Akpom should have asked for a "limiting instruction as to the testimony that led to the arrest

---

[2] The government refers to Dai as Sean Nguyen in its brief. (See Doc. 11 at 15). Nevertheless, it is clear from the cites in the government's brief as well as the nature of the arguments that Dai is the person at issue.

of Dai," there is no evidence to suggest that the jury knew of Dai's arrest, so there would be no reason to give them a limiting instruction about that fact. Finally, as for Morka's argument that Akpom should have been given the chance to impeach Dai's testimony based on Dai's contradictory statements in the first trial, Akpom said in his affidavit that he had reviewed the testimony from the prior trial in preparing for Morka's trial. (Doc. 12, Akpom Affidavit at 4-5). Thus, he had ample opportunity to impeach Dai on those points.

### J.  Conclusory Allegations

Additionally, Morka alleges in a conclusory fashion that counsel erred by (a) presenting weak and unconvincing arguments and "giving up" to the prosecutor, and (b) failing to interview unspecified potential witnesses. (Doc. 2 at 8). However, summary allegations of ineffective assistance of counsel without any level of specificity must fail. *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

### K.  Presumption of Prejudice

Finally, Morka argues that given the extreme deficiencies in counsel's performance, prejudice should be presumed under *United States v. Cronic*, 466 U.S. 648 (1984).

The Supreme Court has established three ineffective-assistance-of-counsel circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658-59. These three situations are when (1) there is a complete denial of counsel; (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) counsel is called on to render assistance under circumstances where competent counsel very likely could not. *Id.* at 659-62. In these situations, prejudice may be presumed. *Id.* For the second *Cronic* exception to apply, "the attorney's failure must be

complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002). "For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*," a case does not come under *Cronic* merely because counsel failed to "oppose the prosecution . . . at specific points" in the trial. *Id.* Thus, it is not enough for the defendant to show mere "shoddy representation" or prove the existence of "errors, omissions, or strategic blunders" by counsel. *Jackson v. Johnson*, 150 F.3d 520, 525 (5th Cir. 1998). "[B]ad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice." *Id.* (citations omitted).

The only *Cronic* exception that would even conceivably apply in this case is the second one. Nevertheless, one cannot characterize Akpom's representation as a "complete failure." *Bell*, 535 U.S. at 697. Even a brief perusal of the trial transcript reveals that he extensively cross-examined the government's witnesses, made cohesive opening and closing statements, and presented a coherent, albeit ultimately unsuccessful, theory of defense. Accordingly, Morka's claim based on *Cronic* cannot succeed.

## IV. Claims of Ineffective Assistance of Appellate Counsel

Morka first incorporates all of his claims of ineffective assistance of trial counsel by reference and argues that appellate counsel was ineffective for failing to raise those arguments on appeal. (Doc. 2 at 63). On a related note, he contends that he received ineffective assistance of appellate counsel because counsel failed to raise the issue of ineffective assistance of trial counsel. (Doc. 1 at 7).

The government maintains that because Morka failed to show any ineffective assistance of trial counsel, he cannot demonstrate deficient performance of appellate counsel in this regard. (Doc. 11 at 15-16).

"A criminal defendant has a constitutional right to receive effective assistance of counsel on direct appeal." *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000) (citing *Hughes v. Booker*, 203 F.3d 894, 895 (5th Cir. 2000)). The court analyzes a defendant's claim of ineffective assistance of appellate counsel using the familiar two-part *Strickland* test. *Id.* at 348.

For the reasons discussed in the previous section of this memo, Morka's claims must fail. First, appellate counsel was not deficient for failing to raise the arguments Morka asserts against Akpom because each of those allegations is meritless as previously stated. Second, appellate counsel was not ineffective for not raising as an issue Akpom's alleged ineffectiveness because the preferred method for a federal prisoner to challenge trial counsel's actions is in a section 2255 motion, not on direct appeal. *Massaro v. United States*, 538 U.S. 500, 502-06 (2003).

Second, Morka also argues that appellate counsel did not read the entire trial record as evidenced by his failure to catch two erroneous record citations in the government's brief. (Doc. 2 at 63). The government argues that Morka is mistaken and submits in support a copy of the referenced page to demonstrate the correctness of its citations. (Doc. 12 at 16).

Morka's claim is baseless because there is no evidence in the appellate record from which to draw this conclusion. It is sheer speculation. Appellate counsel did not file a reply brief on direct appeal and thus would not have had cause to point out any alleged mis-citations in any event. *See* U.S.C.A. Docket Sheet No. 08-10125.

Third, Morka contends that appellate counsel presented a frivolous appeal and wrongly failed to raise the issue of prosecutorial misconduct. (Doc. 1 at 7; Doc. 2 at 63). Again, however, these claims are conclusory and thus insufficient to warrant section 2255 relief. With the exception of mentioning prosecutorial misconduct, Morka does not alert the court to any

other issues that counsel should have litigated on appeal, and he does not explain what particular instances of purported misconduct by the prosecutor counsel should have raised. *Green*, 882 F.2d at 1003.

## V.     Recommendation

For the foregoing reasons, the court should **DENY** Morka's section 2255 motion to vacate.

**SO RECOMMENDED on** August 27, 2010.

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE